Good morning, Your Honors. May it please the Court, my name is Mary Ann Dugan, representing the appellants in this case. The appellant. And I don't know how, if this would work, but I would like to reserve 10 minutes. We'll see how that goes. Not every timber sale requires a full environmental impact statement, obviously, because not every sale, quote, may have significant impacts on the environment. The East Fork timber sale is larger scale and is likely to have greater environmental impacts than most timber sales. There are several reasons why this sale may have significant impacts. This sale is very large. It is, by defendant's admission, going to log 10 percent of this watershed. That is set out in the ER at 271 to 272 and at 175. Two thousand acres of logging dispersed over a 25,000 acre area. This is a key watershed, meaning it was set aside in the Northwest Forest Plan, not set aside, but designated, as a place unusually valuable to riparian species, to fish. And it is key. It's called key for a reason, because it's key to the aquatic conservation strategy component of the Northwest Forest Plan. Now, just to reiterate or to iterate, I guess, since I haven't iterated it yet, we are not here to try to enforce the provisions of the Northwest Forest Plan, the aquatic conservation strategy, the late successional reserve provisions and so on. The point is that, and I will go through the remainder of the list, there are so many factors in this timber sale that are going to be likely to have a significant impact that were not adequately disclosed in the environmental assessment. This sale does not comply with NEPA, the disclosure statute. There is also, of course, the National Forest Protection Act claim. I'm sorry, National Forest Management Act claim. That is a separate issue, which I will get to after the NEPA issue. This sale will log 65 acres within. Council, I do have a question for you. You can think about it, address it at any point in your argument. But is it possible to have a violation of the National Forest Management Act and not have a violation of NEPA in a case where there was an EA? In other words, can you have an NFMA violation if there's no significant environmental impact? Yes, Your Honor, and I'll just answer. I think that those are two very separate issues. The National Forest Management Act claims in this case are twofold. I'll just very briefly state them. They are that the defendant did not do surveys for management indicator species and that the defendant did not demonstrate that this project will retain the condition of the riparian areas and the aquatic system. On that part of it, I have a question. The district court on page 25 of the order concluded that you were not challenging the agency's proxy-by-proxy methodology. Is that correct? In a way, it's correct because there wasn't even really a proxy-on-proxy done here. I don't think that's accurate. I think that the government has characterized it as a proxy-on-proxy approach where the government is surveying the condition of habitat as a proxy for surveying for the species, which themselves were set up as a proxy for other species in this area. That is not technically accurate. We are arguing that this is a proxy. So you argued that point below? Yes. So that characterization, whether if that was a district court's interpretation of it, there was a challenge to whatever they did in terms of the methodology or whether, in fact, it qualified. Because obviously you can study the species or you can do the proxy-on-proxy, right? Habitat surveys. The habitat survey. And it wasn't a species study here. No, it was not. And, in fact, there were not even purported to be any adequate habitat surveys. They merely are trying to get out of the survey requirements based on some case law that is very, very distinguishable. Which one do you think is your strongest argument on the methodology of the different species? Because obviously they treated the spotted owl differently. I guess the area that I'm probably going to ask them about the most has to do with the fisher. Okay. Because there was more done on other things than on the fisher. But my understanding of their argument to some extent is that the fisher lives in the same place as the spotted owl, and therefore the fisher will be okay. Well, there's quite a bit of overlap between fisher and spotted owl habitat. But there is one crucial difference, which is that fisher, which are kind of like these little mink-shaped creatures, they use a lot of undergrowth. And so actually the fuels reduction component of this project will also have an impact on fisher as well as the logging component, whereas the owls are not really affected as much by the removal of undergrowth. But to get back to your original question, the failure to survey at all for MIS, Management Indicator Species, is just they really had no explanation for why they did that. Well, I guess what I want, you know, that, I mean, our job here is that we have to, you know, when is enough enough, all right? That it's not uncommon to have people appear in front of us that say someone in your position would always say, you want them to do more than they do. And that may not be required. It may be enough what they're doing. And they're going to say, but there may be instances. And here, what more could they have done with the fishers than they did? Okay. Well, fisher is- Why isn't it enough? Okay. One thing to keep in mind about the fisher is that at the time the project was proposed and the EA was written, the Fish and Wildlife Service had not yet come out with its federal register notice on the fisher, which stated this animal, this species, is warranted for listing under the Endangered Species Act as either threatened or endangered. That's how bad the status of the fisher is. But Fish and Wildlife said listing is precluded at this time by other priorities that we have. So the information in that very lengthy and detailed federal register notice was not something that was before the decision maker. However, the information itself, I should say the federal register notice was not before the decision maker. The information leading up to that decision was definitely before the decision maker because our clients had raised the current study status of the fisher and said, look, this species is being considered for listing as threatened or endangered. It's in very bad shape. And number two, defendant, you acknowledge that there's fisher throughout this area that could be affected. Yet they did not go out and do a single survey. They have not surveyed for fisher except back in, I believe, 1997 or 94. They did one week of surveys. I should double check the date, but it's somewhere back in that time period. And so fisher is a very interesting... But the law doesn't require them to do a survey of the fisher. So what... That's not exactly true. NEPA says that if the information is necessary to determine what the impacts are, if there's missing information and it would not be extraordinarily expensive to go get that information, that the government does have a duty to gather that information. That's 1506.22, 40 CFR. The government cannot just say, we don't know, we're going to do an EA. In the few cases where they have been allowed to say, we don't know, that's one of the factors where they are required to do an environmental impact statement because of the risk of doing something in a void, of having an unknown about a very potentially significant impact. The National Parks case comes to mind, where the government was looking at whether to allow cruise ships in Glacier Bay. And just said, you know, we don't really know. Let me get you more specific because I'm very task-oriented here. In terms of, let's say I have a problem with the methodology on the fisher. And I say that, you know, I don't think that that's sufficient. Does that necessarily mean that they didn't take a hard look regarding or evaluating the NEPA changes? Or, I mean, does that necessarily follow or it could follow? It's a little bit like what Judge Gould asked. You know, if I find a violation there, do I necessarily have to find that they didn't take a hard look? Well, okay, first of all, the issue of methodology, if that's what we were here about, it might be a different and more difficult case. We're not arguing about what methodology they used. They used no methodology. The surveys were from one week in 1994, and that's at ER at Toronto. Let's say I agree with you on the fisher. Okay. All right, does that mean that they didn't take a hard look initially? Well, in Ocean Advocates, this court said that a single significance intensity factor could be enough. But what we have here is an actual lengthy list, which I was going to go through, but I think, I mean, I can do that, but in the brief, we've gone through that. We've got impacts to the northern spotted owl, which is listed. We have a lot of them listed. Yeah, we've got endangered fish. We've got the LSR impacts, the riparian reserves, the key watershed, the fact that this is 10% of the watershed. We've got the cumulative impacts from the adjacent private parcel that was recently logged of 304 acres, 50- to 80-year-old trees, logged directly adjacent to one of the units, which was totally glossed over, entirely glossed over in the EA, where the EA said, oh, yeah, there's an adjacent private parcel, but don't worry, it's not going to be logged. That's ER 139-43 and 175 and ER 366. The EA says it's not going to be logged, don't worry about it, and then it's logged. These are significant things piling up on significant things. The regional forester initially reversed the finding of no significant impact, saying that, number one, you did not analyze the impacts to wildlife from logging large trees. Number two, you did not analyze whether this was. . . Okay, but that's not what we're reviewing because it went back and they changed it and we're reviewing. . . They didn't change it. They did not change it. That's a big issue. These are factors that pile up to create a very clear view that this project, quote, may significantly impact the environment. That is the standard in this circuit. The burden is on the defendant, on the government, to put forth a, quote, convincing statement of reasons that explains why the project will not have significant impact. I see that I have seven minutes left, and unless the Court has other things for me to answer before rebuttal, I will retain the remainder of my time. Would you address a little bit the argument about the alternatives that were not looked at or the ones that were versus the ones that should? Yes, Your Honor. No alternative was looked at. The only alternative that was looked at is the one that's required by NEPA, which is the, quote, no action alternative. The plaintiff raised several alternatives in their comments. The government responded that those would not satisfy the purpose of the project. This Court in Muckleshoot said, if there's only one alternative that will satisfy the purpose and need, that means your purpose and need is too narrow. That's in footnote 7 of the Muckleshoot case. I thought they had something besides the fancy. They have the proposed action, which was option two, and they had option one, which is the, quote, no action alternative. So wasn't that two? I'm just counting. One, two. It's the two that are they can't have one. NEPA requires that they put the, quote, no action alternative. They have a proposed action. They have the no action alternative. If that was sufficient, if that was always sufficient, there would be no reason for the Muckleshoot court to have a footnote that says, if you narrow it down to. It might sometimes be sufficient. Sometimes that might be sufficient. But let me ask this. If they define their purpose as making enough money to include making enough money from commercial logging sales to pay for the thinning, doesn't defining the purpose, including the monetary element, necessarily mean they've got to do commercial scale logging? Your Honor, I still would argue there could be limits on the diameter of the trees. There could be limits on staying out of the late successional reserves, staying away from the two spotted owl activity centers that will be impacted. Of course, there can be more alternatives, and they could still make money to do the fuels management. Narrowing it down to one alternative, one action alternative, is a red flag that there is that alternatives were not adequately looked at, which are supposed to be the heart of the environmental impact statement or environmental assessment. So it's your position that the agency's rejection of public proposals or public suggestions is not a consideration of an alternative when they simply reject them? Yes, Your Honor, that is our position, that if it were that easy to just brush them off without any analysis, then that's what they would do all the time, which they do quite often. But the NEPA requires that each alternative be analyzed as far as how it will affect the environment and what the different outcomes will be. The alternative has to be considered by the agency, not simply taken as a part of public comment and say that doesn't fit our objectives. Exactly. They have to consider the, actively consider the alternative, whether proposed by someone else or within the agency. Yes, Your Honor. Thank you. All right. You want to reserve the balance? Thank you. Please be seated. May it please the Court, my name is Alan Brabender, and I represent the United States Forest Service in this appeal of a fire prevention and tree thinning project in the East Fork Watershed of the Shasta Trinity National Forest in Northern California. The East Fork project, as it has come to be known, is primarily designed to move the project area, which is currently overstocked beyond healthy capacity and at high risk for wildfire, to move that project area towards the desired conditions identified in the forest plan. Those conditions are forests that are resilient to fire, insect outbreak, and disease. Another purpose of the East Fork project is to accelerate the development of old-growth forest. To accomplish these objectives, the East Fork project will remove excess trees and fuels within the East Fork Watershed. It will be a thin-from-below project, which in this type of project, trees from lower crown classes are removed from the stand, leaving behind the larger trees. As stated in the environmental assessment, the removal of this competitive and typically suppressed understory component is designed to enhance the health and vigor of the remaining trees, contributing to an increase in stand health and resiliency to disturbance. The overwhelming majority of trees proposed for harvest are between 5 to 12 inches in diameter, and nearly all trees are under 18 inches in diameter. And again, there will be no harvested old-growth forest. Because the East Fork project is designed to benefit the forest and its wildlife habitat, it will not adversely impact any endangered, threatened, or sensitive species. The Forest Service therefore reasonably concluded in its environmental assessment. That's fairly easy to say, but to say that's what the project wants to do is one thing, but to build a major road through a fissure nesting or living area would certainly injure the fissure, even though it might be in support of the project. So it's not enough to say the project is intended to do all these wonderful things. You have to look at the impact on the environment, don't you? That is true, and the Forest Service did that and determined that there would be no significant impacts on any endangered, threatened, or sensitive species. And just to, I'm not sure, to maybe eliminate confusion, you could have been proposing a hypothetical, but there are no new roads proposed in this project. No, that was a hypothetical, but you had made a general statement that as long as we're proposing to do something wonderful, it doesn't really matter how we do it, was what I heard you say.  Well, I have, you know, I know that you have prepared remarks, but we have a few questions. So I want to talk about what methodology are you using to perform an MIS habitat analysis under the Northwest Forest Management Act? I have problems seeing what your methodology is here. Okay, well, I think I have to, to answer your question, I have to back up and I think I have to explain a couple things. And the first thing is that I have to explain the 1982 regulations. And the 1982 regulations required the Forest Service to maintain viable populations of species. And that was at 219.19 of the 1982 regulations. 219.19.A6 required the Forest Service to monitor populations of management indicator species to assess or estimate the effects of a project on species viability. However, the 1982 regulations have been repealed, were repealed in 2000, November of 2000, and so there is no longer the viability requirement or the monitoring of the MIS species requirement. So that is irrelevant to this case, Your Honor. So you don't have to do anything on that? Well, the NFMA, the National Forest Management Act, requires the Forest Service to maintain a diversity of species, plant and animal species in the forest. And the Forest Plan sets out a series of habitat assemblages to be used as management indicators to assess the or estimate the impacts of a project on species diversity. So as relevant to this project and to answer your question, what the Forest Service did here is it sent people out into the forest. It looked at the habitat. It then analyzed the impacts of a project on that habitat. It concluded that those impacts would be insignificant and overall beneficial for that habitat and therefore concluded that the project would maintain species diversity. But I guess what was the methodology? I know they concluded that, but what was the methodology? The methodology was they went out and looked at the habitat. They actually sent boots on the ground, sent people out there, and analyzed the habitat and the potential impacts. Is there any data or anything? Do we have any? Well, the Forest Service describes the fact that it went out there and looked at the data in its wildlife report, I believe, and also in the EA. Okay, so that's enough if you just go out and look and you say, no impact, looks good. Well, I guess I don't understand your question, Your Honor. Well, you did quite a bit on the spotted owl, but that's an endangered species, right? What did you do on the fissure? Well, for the fissure, now I think we're talking about NEPA. On the fissure, the Forest Service compared spotted owl habitat, which is very similar to that of the fissure, compared spotted owl habitat or analyzed spotted owl habitat and determined that there would be no significant impacts on that habitat and then used that to determine that there would be no impacts on the fissure. I saw a picture of the fissure, and the fissure doesn't look like the spotted owl. I'm assuming that the fissure's not up in the top of the trees or anything along. Now, what is the evidence in the record that says that what you did on the spotted owl would be sufficient for the fissure? Well, again, the spotted owl— They always live in the same place? And where you see a spotted owl, you see a fissure? Or how do we tie that in? Well, the Forest Plan itself, again, it sets out management assemblages or habitat assemblages, and it itself groups the fissure in with the spotted owl. So the Forest Service is doing what its plan says to look at spotted owl habitat, compare that with that of the—or it is comparable to that of the fissure, and that's what it did. And this project will not degrade. Counsel, I thought part of what they said was that with regard to the spotted owl, you know, anywhere we're aware of a nest up there, we're going to tiptoe around it, and we're not going to be up in the tall trees. If the fissure has a burrow or a nest down in the underbrush and the spotted owl has nests somewhere way up in the tree, how does the treatment of the owl necessarily protect the fissure? Well, the Forest Service is protecting not only spotted owls but spotted owl habitat, and spotted owl habitat includes downed logs and woody debris. And as mentioned in the EA, the project will retain nearly all snags, standing dead trees, and 15 tons of woody debris per acre will be retained in the fissure habitat area. And moreover, there will be no old-growth forest that will be touched in this project. And so because of that, and the fact that this project is designed to improve spotted owl habitat conditions and accelerate the development of old-growth forest, it will also improve fissure habitat over time. And any impacts, any indirect impacts or short-term impacts to individual fissures as a result of noise from project activity will be short-term, will be small-scale, localized, and easily avoided because the fissures are very mobile and versatile species. What one of the one of these. Go ahead. Let Judge Nelson go ahead. Go ahead, Judge Nelson. I'm listening. OK. One of the one of the major holes that your opponents are trying to kick in the EA is alternatives. And they're saying that the considerations of alternatives was not only insufficient, but basically nonexistent. So what's your response to that? Well, first of all, I would point this court to this court's June 2006 decision at the Forest Service when this very same plaintiff and this very same counsel made this exact argument to this court and this court rejected it. But beyond that, this case is a case in which there'll be insignificant impacts to the environment. And when in such a case, it doesn't make much sense to require the Forest Service to consider more environmentally friendly alternatives when the alternative is going to have an insignificant effect on the environment in any event. And I think the cases that the cases that are cited by by Epic and I think mentioned by counsel here today involve an EIS, not an EA. In that situation, it was determined that the projects, whatever was being challenged, was going to have a significant impact on the environment. And therefore, that trigger triggers the additional consideration of minimums or of alternatives. What's your best case for saying that you need fewer alternatives when you're looking at an EA instead of an EIS? Your Honor, I believe we cited a case in our brief. I don't recall the name of it right now. There are several things in Epic's reply brief that I'd like to address now. And the first is that Epic bears the burden of proof in this matter because this is an APA case. In APA cases, the validity of the agency action is presumed. And so it's Epic that must show that the Forest Service's actions were arbitrary, capricious or not supported in the record. And Epic does not even really attempt to do that here. Or that they were contrary to law. That's correct, Your Honor. Under the APA, it could be arbitrary, capricious or contrary to law. So if Epic succeeds in showing that there may be a significant environmental impact, then it would show that doing an EA was contrary to law, I guess. Right? That's correct. And second, in its reply brief, despite – well, I guess maybe I should back up. In regard to the Fisher on page 6 of its reply brief,  there are no known private treatments proposed at this time, meaning 2002. Epic alleges this statement was false. Again, apparently trying to portray the Forest Service in bad light. However, what Epic cites to support its assertion that no private projects were proposed in 2002 is the 2004 wildlife report, a document which was prepared two years after the 2002 document and which incorporated information discovered subsequent to the 2002 wildlife EA. By 2002, a project on private land had been proposed. And as discussed in our brief and as found by the district court, the Forest Service took into account the cumulative impacts caused by this private project before issuing its FONSI, or its finding of no significant impact. And I think one more point in this regard is that Epic failed to raise the cumulative impacts of logging on private land issue during the administrative proceedings. It therefore failed to exhaust its administrative remedies on this issue. And I think what is determinative of this question is that in its reply brief, when challenged on its failure to raise the issue, it did not cite to anything in the administrative record showing that it in fact raised this below. And this is despite the fact that its letters to the agency and its briefs in the administrative proceedings are in the record. Next, the information on the Northern Spotted Owl contained in the 2002 wildlife EA was current at the time of the Forest Service's April 2004 decision. And the Forest Service reasonably relied on that information when determining that the project would not significantly impact the Northern Spotted Owl. As the 2004 wildlife report acknowledges, these surveys revealed no new information in the years between 2000 and 2004. Thus, the 2000 information remained current and valid. And I think one more point I'd like to make. Council, I have a question for you. And you may not be in a position to address this today, but yesterday the Ninth Circuit decided a case, Oregon Natural Resources Council versus Bureau of Land Management. And it held that an EA was inadequate because it didn't show objective quantified assessments about environmental impacts. I wonder if you'd have time, if you'd looked at that case, which just went on the website yesterday, so you may not have, but if it was significant, if you were in a position to comment at this time on it. Your Honor, I'm aware that that case was decided yesterday, but I was on a plane most of the day and I did not get a chance to read it. So I guess I'm not in a position. Okay. If we need views of both sides on it, we'll send out an order asking for a supplemental brief. Okay. Are there any further questions? There do not appear to be. Thank you for your comments. Thank you. Thank you, Your Honors. I did very briefly skim that case yesterday, Judge Gould, and not enough to be competent to respond about that. I think I would want to put in a 28-J letter to the Court on that case because it does talk about cumulative impacts, which are at issue here. Regarding the issue of alternatives, this Court has made very clear that both environmental assessments and environmental impact statements require a full analysis of a range of alternatives. The Bob Marshall Alliance case is an example of such case law. The fact that a project will have some beneficial impacts, even net beneficial impacts in addition to adverse impacts, is explicitly set out in the NEPA regulations as not enough to get out of an environmental impact statement. That's factor one under the ten intensity factors, which are set out at 1508.27. Impacts that may be both beneficial and adverse can be significant. A significant effect may exist, even if the federal agency believes that on balance the effect will be beneficial. As for roads, there are some new roads proposed. By the way, this is set out in our brief, eight miles of new roads, 2.1 miles of temporary roads. Under NIFMA, the defendant has raised a new argument on appeal. I would ask that you do not consider this argument. They are arguing now that the new MIS regulations retroactively apply to this sale. And, Your Honors, if you do consider it, we would just submit that they cannot apply retroactively to this sale. Regarding the MIS habitat surveys, if you scrutinize their brief and the pages of the ER that they cite, they did not go out on the ground and survey habitat. They cite ER pages 273 to 78 for that proposition. That's their brief at 44. But what they talk about is looking at, for example, the North American Breeding Bird Survey, a huge, broad survey of where, in general, breeding birds are located. The 1998 Black Bear Management Plan. These are generic, very general studies, some of them from as far back as the mid-'90s. These are not habitat surveys. They did not go out on the ground and look at the habitat. The Fisher may be versatile and mobile, but it is currently warranted for listing as endangered or threatened. Its primary direct threat to its continued existence is logging and fuels management. Those are the two primary threats. The burden is on the defendant. Once the plaintiff has raised significant questions as to whether the project may have significant impacts, that's the Ocean Advocates case which most recently says that, the burden is on the defendant to have a convincing statement of reasons as to why the impacts are not significant. The exhaustion issue regarding cumulative impacts, my recollection is that was not raised below. That's why in the executive record we don't even have the administrative appeals that were submitted. The plaintiffs did raise cumulative impacts, discussing cumulative impacts from both other federal logging and from private logging. And unless there are more questions, Your Honors, I would submit this to you, and I would ask that you reverse the district court's decision. Thank you very much. There do not appear to be any further questions. This matter then will stand submitted, and this court will be in recess until tomorrow at 930. Thank you. Thank you.
judges: T.G. Nelson, Gould, Callahan